```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK



LOUIS A. DEL VALLE,            *     Case No. 10-CV-5210(ERK)
                               *
            Plaintiff,         *     Brooklyn, New York
                               *     May 24, 2011
      v.                       *
                               *
INTERNATIONAL UNION OF         *
 OPERATING ENGINEERS, et al.,  *
                               *
            Defendants.        *
                               *
 * * * * * * * * * * * * * * * *
```

            TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
                 BEFORE THE HONORABLE ROANNE L. MANN
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:              ANTONIA KOUSOULAS, ESQ.
                                Kousoulas & Associates
                                41 Madison Avenue, Suite 4000
                                40th floor
                                New York, NY  10010


For the Defendant:              VINCENT MICHAEL GIBLIN, ESQ.
                                RAUL GARCIA, ESQ.
                                Pitta and Giblin, LLP
                                120 Broadway, 20th floor
                                New York, NY  10271




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 3:35 p.m.)

2               THE CLERK:  Civil cause for initial conference,

3     docket no. 10-CV-5210, DelValle v. International Union of

4     Operating Engineers.  Please state your appears for the

5     record.

6               MS. KOUSOULAS:   Antonia Kousoulas for Louis

7     DelValle.

8               THE COURT:  Good afternoon.

9               MR. GIBLIN:  Good afternoon, Judge. Vincent Giblin

10    and Raul Garcia with Pitta and Giblin on behalf of the

11    International Union of Operating Engineers.

12              THE COURT:  All right. Welcome to all of you.

13              Please be seated and you're welcome to remain

14    seated during this proceeding.

15              First of all, I received an ECF bounce either today

16    or late yesterday. I don't recall which, in which one of the

17    parties -- and I don't recall which side, filed automatic

18    disclosure.

19              Under the Federal Rules of Discovery, documents are

20    not to be filed with the court unless they specifically

21    relate to an issue pending before the court.

22              So from here on in, please, you serve discovery on

23    the other side, but do not file it unless it's required in

24    connection with an issue pending before the court.

25              Before we turn to scheduling, I'd like to get a

3

1    better sense of the underlying facts in the case. I've read

2    the pleadings, so I have a picture of what the plaintiff is

3    alleging.  What is the defendant's version of what was

4    happening here?

5           MR. GIBLIN:  Local 14 is a union that essentially

6    operates heavy equipment.  If you look out in the sky, you'll

7    see tower cranes and other types of equipment that the union

8    and the members are responsible for operating, maintaining

9    and the like.

10           They operate a referral hall through which members

11    are referred out.  There's a formal process for that to

12    happen.

13           Under federal labor law, a referral hall, as

14    opposed to an exclusive hiring hall, is a place where

15    individual members can go out and solicit their own work so

16    they can operate the equipment.

17           Exclusive hiring halls are a little bit different

18    in the sense where a member is precluded from doing that.

19           As it relates to the master mechanic position, that

20    is a creature of collective bargaining.  Essentially, the

21    collective bargaining agreement -- the collective bargaining

22    agreement specifies that when certain manning conditions are

23    reached, namely, how many operating engineers are performing

24    bargaining unit work in any one particular location.  Most of

25    the collective bargaining agreements, if not all, specify

4

1    five.

2              So in that situation most of the power cranes that

3    you see in the sky have two operating engineers on them; one

4    kind of maintenance and one kind of business end.  So when

5    you see them, when the critical mass of five is reached,

6    there is a collective bargaining agreement provision that's

7    triggered and the union is afforded the ability to assign a

8    master mechanic to the location, subject to the consent of

9    the employer who is responsible, or the signatory to the

10   contract.

11             In all these situations, each of the -- it's kind

12   of a little bit different based on the pleadings.  We're

13   still doing some investigation, Judge.  But each one of the

14   projects is a little bit unique. You talk about the Delta

15   terminal at JFK, which is one of the positions that Mr.

16   DelValle apparently sought in writing.

17             There are certain characteristics of that job that

18   may be different than lead appointment positions or master

19   mechanic positions that he may have held back in the '90's.

20             Just because it's operating engineers, just because

21   it's equipment, there's a lot of different factors that go

22   into the discretion that's afforded the business manager.

23   He's essentially the CEO of the union and the employer about,

24   you now, who was picked and how that's assigned.

25             It's the union's position at all times they

1  fulfilled the collective bargaining agreements and they

2  assigned individuals that were qualified for those positions

3  and there was no racial or discriminatory motive in that

4  selection process at all.

5          More importantly, what I think the record will bear

6  out -- we're still kind of taking a look at this -- Mr.

7  DelValle was one of the top wage earners of Local 14 in

8  total.  So if wages -- you know, the W-2 wages that an

9  operating engineer normally puts in his pocket and brings

10  home to his family.

11          On the other side of that there are multi-employer

12  benefit funds; pension, welfare, annuity, which is

13  essentially a 401(k) and some other benefits that employers

14  agree to pay a fixed monetary amount into, which is openly

15  administered by a joint board of union employer trustees, and

16  based on the plan documents, summary plan descriptions and

17  the like, there's vesting in a pool -- formulas that are at

18  play.

19          And what we expect the record to bear out in both

20  of those situations, both the wages and the benefits, is that

21  Mr. DelValle was -- you know, at the top of the wage earner

22  side of things with Local 14.

23          And when you think about how -- you know, having

24  steady employment as an operating engineer because there's no

25  manning threshold, sometimes having a long-time -- a long

6

1    term job as an operating engineer, as opposed to one that

2    could be subject to elimination based on a reduction in force

3    or a closing of a particular area of the project where the

4    number goes from five to four could actually be a benefit to,

5    in this case, Mr. DelValle.

6                So one of the things that we're going to really

7    take a hard look at is whether Mr. DelValle, even if those

8    allegations were true, that he was damaged.

9                We suspect that the monetary amounts that he gained

10   or earned in wages and benefits will show that there was no

11   damage at all.

12               But I just want to emphasize that the union

13   operates in a lawful, bona fide manner with no discrimination

14   at all in this regard.

15               And I think a fair review of the complaint even

16   bears that out.  This isn't a situation where there's an

17   allegation at all about a racial epithet.  Any insensitive

18   statement about national origin or the like, so that kind of

19   takes us out of one category and brings us into the disparate

20   treatment and impact, which becomes more statistical and more

21   empirical, as opposed to your, you know, core discrimination

22   case.

23               We believe that the absence of those statements

24   really illuminate, you know, what was going on during that --

25   there was, in fact, no discrimination at all and whatever

7

1    policies or selection criteria were there, were all done with

2    proper purposes and motive.

3              THE COURT:  You mentioned that the plaintiff was

4    one of the top wage earners and then you referred to benefits

5    and I thought you were going to say that the was also at the

6    top in connection with the benefits that he received.

7              You didn't say that, and I'm not sure if you

8    weren't applying it.

9              MR. GIBLIN:  I blended the two concepts.  At the

10   end of the day, the manner in which certain benefits are

11   accrued, based on a quarterly measuring and work hours within

12   those time periods, what you'll see is for all quarters Mr.

13   DelValle reached the necessary hours to insure himself and

14   his family he had the necessary work hours to have pension

15   credits, which ultimately if there's no break in service

16   somewhere down the road, he'll enjoy a vested credit, or a

17   pension, according to the plan rules and 401(k) is a fixed

18   hourly sum, no different than any of us that have the benefit

19   of that where there's a fixed hourly sum that goes into

20   account that is -- you know, put into a 401(k).

21             THE COURT:  All right. Thank you.

22             Ms. Kousoulas, do you want to respond?

23             MS. KOUSOULAS:   With regard to being a top wage

24   earner, the only thing I can say, Your Honor, is that my

25   client, through his own efforts, has managed to keep his

1    salary at a level that one may consider, you know, high.

2          I don't have records to compare that -- his salary

3    to anyone else's at this stage, so I really don't know, based

4    on information I have from my client. It doesn't appear to be

5    the case.

6          As I understand it, master mechanics can earn

7    $400,000 per year. Operators can sometimes earn $200 per

8    year.

9          My client gets up very early in the morning,

10   travels to the hall to make sure that he's able to get as

11   much work as possible so he can support his family.

12         I don't think that the defendant should take credit

13   for that. I mean, clearly, he has not been assigned to any

14   long-term master (inaudible) master mechanic position since

15   he's complained about discriminatory practices.  He has not

16   been assigned to any long-term project.  The longest I

17   believe in the past year and a half have been three weeks.

18         Sometimes he's assigned for a day, or two days, or

19   three days and he has to get up very early in the morning to

20   go to the hall and get other piecemeal assignments and the

21   like.

22         I believe by his estimate he had been assigned to

23   53 or 54 different job sites that are given out on a first

24   come, first serve basis.  You have to get to the hall early

25   enough (inaudible) in the course of the past year.

9

1          This is also -- raises issues of retaliation and

2     one thing -- and, again, I'm looking into this because I just

3     got word from my client is that he was removed for not -- his

4     name was not forwarded to the -- voted in as a teller for the

5     union, and that's a position he had for a long time and this

6     was the first year that (inaudible) consideration for that

7     position.  We think it's retaliatory.  Again, this is a

8     recent development.  It's (inaudible).

9          THE COURT:  All right. Is there anything else any

10    of you would like to raise before we turn to scheduling?

11         MR. GIBLIN:  Just -- I just want to clarify.  The

12    union operates a referral hall for all members in the

13    morning.  If they haven't solicited their work, they go to a

14    designated location where calls come in from employers

15    seeking work.

16         And the way that it operates is by -- on a first

17    come, first save basis.

18         So the operation of the referral hall has nothing

19    to do with discrimination. It has everything to do with

20    fairness.  This is the marketplace where people come and the

21    first person in the door that has a particular qualification

22    gets called out, announced and then the job is assigned that

23    way.  It's a function of labor law.

24         So, you know, if, in fact, a premium job came in

25    that Mr. DelValle hypothetically was eligible for but he was

1   lower on the list that day because somebody else actually

2   signed in or stamped in first, it would be a de facto

3   violation of federal labor law to assign that to somebody

4   else.

5               So I think a lot of this, not a lot of people --

6   and you know, myself, you know, had chose this side of the

7   career, get this deep into labor law, construction law and

8   the like.

9               But I just encourage the court to have an open mind

10  about these kind of fine or more technical points of labor

11  law because -- with an open mind and when we put the facts in

12  I think the true state of affairs will reveal itself.

13              THE COURT:  All right.  Have you conferred and

14  completed the questionnaire that accompanied the order

15  scheduling this conference?

16              MR. GIBLIN:  Yes, Judge.

17              THE COURT:  Would you hand up a copy to Ms. Field,

18  my law clerk.

19              Automatic disclosure has not been completed by the

20  plaintiff yet.

21              MS. KOUSOULAS:   That's correct, Your Honor. I

22  prepared my -- I wanted my client to review them before I

23  (inaudible).

24              THE COURT:  Is there any reason why that can't be

25  served by the end of the week?

1        MS. KOUSOULAS:   Probably not.

2        THE COURT:  All right. I'll give you until Tuesday

3   to do it, because the order scheduling this conference had

4   directed the parties to complete automatic disclosure before

5   today.  So that's the 30th of May.

6        All the dates and deadlines that I give you today

7   will be incorporated into a calendar order which will be

8   entered into the ECF system.

9        So if you're registered for ECF, and you should be,

10   if you filed a notice of appearance, you'll be able to

11   retrieve a copy of the calendar order.

12        You've asked to have until January 20th to complete

13   fact discovery. Do you really need that much time in this

14   case?

15        MS. KOUSOULAS:   Your Honor, the only reason we're

16   asking for that is since the defense in this case, or a part

17   of the defense is that they merely procured labor on behalf

18   of employers and it was the employers who were decision

19   makers in who they chose to serve as the master mechanic.

20        And to that extent, if we're going to get into

21   that, and that's why I proposed it to (inaudible). Obviously,

22   I would start with the union officials.

23        But if they're taking the position that this was

24   really a decision that was taken by the employers, then

25   there's going to have to be some fairly extensive either

1      third party deposition discovery with regard to each and

2      every position and which employer was involved and what was

3      the process that was involved in those cases.

4              And that's why we are exercising some caution here

5      in realizing that we probably have to complete at least four

6      or five depositions -- or four depositions of parties. That

7      we may have to take non-party depositions and those could be

8      complicated (inaudible) get discovery first, find out who

9      these are, serve subpoenas, you know, and try to get

10     everyone's schedule together.

11             And logistically I'm just realizing that that could

12     take a longer time --

13             THE COURT:  Mr. Giblin, were you suggesting that --

14     and maybe you were and that isn't the inference that I drew.

15     Are you suggesting that it's the employers who select the

16     master mechanics?

17             MR. GIBLIN:  I think each situation will present

18     its own unique set of facts.  But at the end of the day

19     there's a contractual provision in the collective bargaining

20     agreement that governs.

21             There is collaboration or discussion about the --

22     you know, two parties in the bi-lateral contract about the

23     selection and, therefore, it may be that there is liability

24     out there for some other party.

25             I don't have the information.  We're still trying

1    to identify the particular job sites, (inaudible), and the

2    like that are out there, and -- but what I can say is it's

3    not that the union abandons their obligation under the

4    contract. It's a -- I want to say a joint appointment. But

5    there's rights involved that each party holds during that

6    selection process.

7          THE COURT: All right. Well, I will grant the --

8    since we're talking about fact specific evidence as to the

9    various jobs and I've heard about -- that there are dozens of

10   jobs just in the last year, I will give the parties until

11   January 20th to complete fact discovery.

12         I'm going to give you a single date for amending

13   the pleadings and bringing in additional parties as of right.

14   It doesn't mean that you cannot -- that you cannot amend

15   after that date. It just means you would need further leave

16   of the court to do that.

17         You've asked to have until -- well, dates between

18   August and October for doing that. I will give you until

19   September 9th for amending the pleadings and bringing in

20   additional parties as of right.

21         What kind of experts do the parties have in mind?

22         MR. GIBLIN: At this stage, Your Honor, we don't

23   have an expert, but (inaudible). I don't know, for example,

24   we may need an expert on damages or (inaudible).

25         But this situation here is not your typical

14

1    employment/employee relationship and how compensation is

2    earned or how much one would have earned, let's say, as a

3    master mechanic (inaudible).  But at this stage I have not

4    made that decision (inaudible).

5            THE COURT:  And what kind of experts is the defense

6    thinking of?

7            MR. GIBLIN:  With respect to medical, we would

8    expect independent medical examinations, because there are

9    mental and emotional damages asserted.

10           We would expect treating physician's records to be

11   either produced or authorizations given so we can

12   individually solicit them.  I'm not sure how Your Honor views

13   treating physicians, whether you consider them expert or

14   factual, but that's a line that we'd like to --

15           THE COURT:  Rule 26 has been amended to address

16   that issue.

17           MR. GIBLIN:  With respect to  non-medical, we would

18   envision a statistical expert, especially given the disparate

19   impact charge.

20           Corporate governance, an individual that could come

21   in and actually explain to a jury the different positions

22   within operating engineers and just the functions, rights and

23   responsibilities under their internal government documents.

24           And then lastly we would have a damage expert that

25   would be -- hopefully, it would be one person.  Just be a --

1      there's a claim of lost wages and lost future earnings, and

2      then hopefully the same person can conduct the actuarial and

3      other kind of forensic studies for pension calculations and

4      the like to the extent damages can be proven.

5              THE COURT:  Is the plaintiff claiming that he

6      suffered any physical or medical consequences for which he

7      required treatment as a result of the alleged discrimination?

8              MS. KOUSOULAS:   Not beyond the standard, you know,

9      emotional distress and resulting physical manifestations of

10     that.

11             THE COURT:  But did he receive treatment?  Did he

12     go to a psychiatrist or therapist?

13             MS. KOUSOULAS:   He has not, Your Honor, but he

14     (inaudible).

15             THE COURT:  For conditions that you say were caused

16     by the discrimination?

17             MS. KOUSOULAS:   Caused or a manifestation of

18     emotional distress.

19             THE COURT:  Well, to the extent that he is claiming

20     that he suffered any kind of medical or psychological

21     distress requiring treatment, authorizations for those

22     records should be provided as part of the automatic

23     disclosure.

24             What I'm going to do is -- unless someone thinks

25     that this is not the appropriate way to proceed -- bifurcate

1  discovery, defer scheduling expert disclosure, rather than

2  scheduling it at this time what I'd like to do is set this

3  down for a settlement conference either at the conclusion of

4  fact discovery or while fact discovery is ongoing.

5        It seems to me based on what I've heard that this

6  is the kind of case where there can be meaningful settlement

7  discussions even before expert disclosure has been exchanged.

8  Does anyone disagree with that assessment?

9        MS. KOUSOULAS:   No, Your Honor.

10       MR. GIBLIN:  We are always interested in persuing

11  settlement negotiations.

12       THE COURT:  All right. So at what point in time are

13  you in agreement that it makes sense to have a settlement

14  conference?  At the conclusion of fact discovery or while

15  fact discovery is still being conducted?

16       MR. GIBLIN:  We've an insurance carrier involved as

17  well, so the general practice with this carrier is at the

18  close of fact discovery to have a communication and if, in

19  fact, they approve some type of settlement authorization, to

20  bring that to court, as well as the insurance representative

21  as well.

22       THE COURT:  So you do not think it would be

23  productive to have the settlement conference earlier; for

24  example, in the fall?

25       MR. GIBLIN:  Not with this particular carrier, but

1  if it was the court's position that that was something you

2  were looking for, I'd communicate that back to the carrier.

3       Clearly, it needs to be after a substantial number

4  of depositions have occurred, including the plaintiffs.  We'd

5  have to figure out whether there were other third parties

6  that could potentially be culpable.  There may be

7  indispensable parties and I just think that that may

8  complicate -- until that's really resolved, it may complicate

9  things a bit.

10       If the court -- one possible situation would be to

11  have a telephonic conversation somewhere in that time frame

12  that we're talking about and then if, in fact, it's

13  progressed to a certain period, we may be able to be bring

14  people in to discuss but I'd hate to schedule it and have

15  people in if we can't -- if we're not at a posture --

16       THE COURT:  Well, I can put this down any time --

17  for conference any time I want, but I don't want to go

18  through meaningless exercise.

19       If this carrier wants to have all the depositions

20  completed, then I don't think it makes sense to have an

21  earlier settlement conference.

22       And the way I do settlement conferences, I do them

23  in person, not over the phone.  They're very detailed and

24  involved. I have discussions with both sides here, then

25  privately and off the record and it's not -- telephone

1    conferences are not conducive to that kind of settlement

2    approach.

3          Let me ask Ms. Kousoulas, when would you ideally

4    like to have the settlement conference?

5          MS. KOUSOULAS:   As soon as possible, Your Honor.

6    Our position is Mr. DelValle continues to work and get jobs

7    through the union.

8          It seems that progressively things are getting

9    worse for him and if we can stop the bleeding, I think in

10   some ways it will also help resolve this case.

11         If he spends funds litigating this and things get

12   worse, then there may be a point of no return for both

13   parties.

14         So my position is as soon as we could have a

15   meaningful settlement discussion, I would like that.

16         THE COURT:  Well, based on what I've heard about

17   the issues in the case, I don't think it makes sense to have

18   a settlement conference with the court until there's been

19   some significant fact discovery.

20         So I think that at the earliest it should be in the

21   fall and I'm prepared to put it down for a settlement

22   conference in the fall.

23         I would like to have clients present.  That would

24   mean the plaintiff and if the carrier is the decision maker,

25   then a representative of the carrier with authority to settle

1   the case.

2           If it turns out that the parties conclude that they

3   need more discovery and would like to have the settlement

4   conference put off, I'm prepared to accommodate you, but I do

5   ask that you please don't show up at the settlement

6   conference only to tell me that you need more discovery.

7           Once you reach the conclusion that the conference

8   would be premature, speak with opposing counsel, see whether

9   or not you're in agreement and then send a letter to me

10  through ECF indicating when you would like to have the

11  conference, and the fact that you'd like to have it put off.

12          So let's put this down for a conference on October

13  14th at 2 o'clock.  And as I said, clients should attend.

14          At that time, if it appears that the case isn't

15  going to be resolved, I will schedule further proceedings in

16  the case either expert disclosure, dispositive motions or

17  both. I'm not going to set any deadlines now for dispositive

18  motions.

19          Are there any other dates or deadlines that any of

20  you would like included in the calendar order?

21          MR. GIBLIN:  Nothing from the defendant.

22          MS. KOUSOULAS:   No.

23          THE COURT:  Let me just go through some

24  housekeeping matters with you.

25          As I said, the calendar order will be entered into

1      ECF. I expect you to comply with these deadlines.

2            If you do need a modification of any of the dates

3      or deadlines, as I indicated a moment ago, speak with your

4      adversary and then send a letter through ECF indicating what

5      change you need, why you need it, and whether it's on consent

6      or not.

7            The questionnaire, unlike the calendar order, is

8      not going to be entered into the court file. It's not being

9      so ordered by me. It's essentially for my information only.

10     It goes in my work file, but not into the court file.  Not

11     into ECF.

12           Those questions that deal with the scope of

13     discovery I leave it up to counsel to modify on consent

14     without further leave of the court.

15           So, for example, if it turns out you want

16     additional depositions or additional requests to admit, or

17     interrogatories, just speak with your adversary.

18           If you're able to work it out informally, and I

19     hope you can, I don't need to hear from you about that.

20           If, however, you are unable to resolve a discovery

21     issue, despite good faith efforts to do so, the way to raise

22     a discovery dispute with the court is by sending a letter to

23     me, not to Judge Korman, unless you're filing an objection

24     from one of my discovery rulings.

25           The letter should be three pages or less.  Any

1    attachments do not count toward the three-page limit.  And

2    the three-page limit applies both to the application, as well

3    as to the response.

4           I think that covers everything that I had intended

5    to.  Is there anything else that any of you would like to

6    discuss today?

7           MS. KOUSOULAS:   No, Your Honor.

8           MR. GIBLIN:  No, thank you.

9           THE COURT:  Okay.  Thank you very much.

10          (Proceedings concluded at 4:17 p.m.)

11    I, CHRISTINE FIORE, Certified Electronic Court Reporter

12    and Transcriber and court-approved transcriber, certify that

13    the foregoing is a correct transcript from the official

14    electronic sound recording of the proceedings in the above-

15    entitled matter.

16

17    *Christine Fiore*

18    _____            June 29, 2011

19          Christine Fiore, CERT

20

21

22

23

24